[Civ. No. 26026.   Second Dist., Div. Three.   Dec. 27, 1962.]

JAMES RAMEY, Plaintiff and Appellant, v. SOCONY MOBIL OIL COMPANY, INC., et al., Defendants and Respondents.

Tanner, Hanson & Myers for Plaintiff and Appellant.

P. E. Bermingham, R. H. Buchanan, Sims Hamilton, Adolf H. Levy, Wise, Kilpatrick & Clayton, Clarence S. Hunt and George E. Wise for Defendants and Respondents.

FILES, J.—This is an appeal by plaintiff from a judgment of nonsuit. On an earlier appeal it was decided that the second amended complaint stated sufficient facts to constitute a cause of action. (*Ramey* v. *General Petroleum Corp.*, 173 Cal.App.2d 386 [343 P.2d 787].) This time the question is whether plaintiff made out a prima facie case against either defendant.

Before the trial the defendant General Petroleum Corporation was merged into Socony Mobil Oil Company, Inc., and the latter corporation was substituted as a party defendant. In this opinion the defendant corporation will be referred to as "General."

On April 16, 1953, plaintiff was injured while working as a rotary helper in a five-man oil-well drilling crew employed by General. The defendant Pacific Drilling Control Company, a partnership, was a specialist in directional drilling who had contracted to furnish services and equipment to General in connection with this drilling operation. Plaintiff received workmen's compensation benefits from General, who was a self-insured employer. On March 27, 1958, this action was

begun against General and Pacific. The second amended complaint, on which the action went to trial, contained two causes of action. The first cause of action was against Pacific and alleged that the negligence of Pacific was a proximate cause of the accident, that Pacific and General had conspired to conceal from plaintiff his cause of action against Pacific, and that he did not discover the facts until October 1957. The second cause of action, against General, incorporated the allegations of the first cause of action and added the conclusion that General owed plaintiff a duty to disclose ''its financial interest in plaintiff's cause of action against Pacific . . . but . . . failed to do so.'' This complaint, as interpreted by the court on the prior appeal, stated a cause of action for personal injuries against Pacific, as to which the statute of limitations was tolled, and an alternative cause of action against General for fraud, the damages for which would be the loss of plaintiff's good claim against Pacific.

At the conclusion of plaintiff's evidence the trial judge concluded that the case failed in two respects: There was no proof of a breach of duty by Pacific, and no proof of any fraud. A failure of proof on either point requires a judgment for both defendants. If Pacific did not injure plaintiff, then there could be no actionable fraud in concealing a nonexistent cause of action. If there was no fraudulent concealment, the cause of action for personal injuries was long ago barred by limitations. Upon an examination of the record, we are satisfied that the trial judge was correct on both points.

■ The time honored rule governing the power of the trial court to grant a nonsuit was stated thus in *Estate of Lances*, 216 Cal. 397 [14 P.2d 768], at p. 400:

''A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] ■ Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.''

## Statute of Limitations as to Pacific

The simplest point may be disposed of first. There is no evidence whatever that Pacific communicated in any way with plaintiff concerning the accident during the succeeding year. There is no evidence that Pacific conspired with General to mislead plaintiff or to conceal anything. The only communication between Pacific and General concerning plaintiff or his injury was this: that the day following the accident when White, one of Pacific's partners, went to the drilling site, some of the men were talking about it and they told him how it happened, and General's drilling superintendent mentioned that a man had been hurt. Since Pacific cannot be charged with any concealment, the action against it was barred by the one-year statute of limitations set forth in Code of Civil Procedure, section 340, subdivision 3.

## Merits of the Claim Against Pacific

The asserted liability of Pacific for plaintiff's injury depends upon an analysis of the relationship of Pacific to the drilling operation.

The oil well was being drilled on General's property. General owned the drilling rig and employed the crew of five, including plaintiff and the driller, Sam Young, who was in direct charge of plaintiff's work. Pacific was in the business of furnishing tools and supervision to control the direction in which a well is drilled. Directional control of the drilling of an oil well is achieved by the insertion of a whipstock (which is essentially a wedge) in the hole at the desired depth, which tool forces the drilling bit off at an angle, thus changing the direction of the well. The well is drilled a short distance in the new direction and then the whipstock is pulled loose. Thereafter the whipstock and bit are pulled up out of the hole and removed from the end of the drill pipe. Drilling is then resumed in the new direction.

In the operation which is involved here the drilling bit was attached, by a threaded connection, to a cylindrical piece of steel 34 inches long called an orienting sub. This sub was attached by a threaded joint to the end of the drill pipe. The whipstock was attached to the drill pipe by a steel ring through which the pipe may slide freely. There is a shoulder on the sub which catches the ring on the whipstock and lifts the whipstock when the drill pipe is pulled out of the hole.

At the time plaintiff came to work at midnight April 15, 1953, the whipstock had been pulled loose from its location

6,421 feet below the surface, and the tools were ready to be pulled out of the hole. About two hours were required to bring the tools up. The accident occurred at about 2:15 a. m. when the crew was attempting to "break" (unscrew) the sub from the drill pipe.

The evidence most favorable to plaintiff supports the following version of the accident and its cause: Before attempting to break the sub, plaintiff was sent to look for a bit breaker. A breaker is a box-like piece of iron which fits in a hole in the rotary table, which is directly over the well. The breaker fits the bit and holds it while the joint above it is being broken. It is customary to use a breaker when breaking any connection within 4½ feet of the floor. On this occasion a breaker could not be located so the driller, Young, said he would drop the bit into the hole to steady it. The drill pipe, with the sub and bit attached, was then suspended over the hole, with the bottom of the bit about 6 inches below the bottom of the rotary table. Backup tongs were attached to the sub, and then plaintiff attached breakout tongs to the drill pipe above the joint. Power was then applied by means of a line running from the tongs to a winch. The driller either applied too much power or the clutch grabbed. The entire assembly jumped out of the hole and swung towards plaintiff, crushing him before he could escape.

Plaintiff's theory of liability on the part of Pacific is based upon (a) Pacific's failure to supervise and (b) Pacific's failure to furnish a breaker.

The contract under which Pacific acted is evidenced in writing only by General's purchase order and Pacific's job ticket. The only other evidence as to the terms of the relationship is in the testimony of White, who was one of the partners in Pacific, and the testimony of plaintiff and two of General's drillers as to how Pacific operated.

The purchase order was a printed form which contained this brief typewritten description of the contractor's duties: "Furnish men, equipment and materials to set (4) removable whipstock and control, as directed." (White testified that the whipstock which was pulled in the early morning of April 16, 1953, was the fifth whipstock which had been set under this purchase order.) No price was stated on the order. On the reverse side of the order blank were printed terms and conditions. One was: "Seller agrees to furnish all labor, material, transportation, tools and equipment necessary to perform the work specified in this Purchase Order at the times and in

the manner, and at the prices herein stated.'' Another provision was: ''Seller agrees that all work herein specified shall be done in a good and workmanlike manner in strict accordance with the conditions herein set forth, as an independent contractor and not as an employee of Purchaser . . . and in such manner as to reduce all fire hazards and danger of injury to persons and property to a minimum.''

Pacific's job ticket and invoice were both printed forms, and each contained only this description of the services rendered:

| ''DATE<br>1953 | SERVICE RENDERED | JOB TICKET<br>No. | TOTAL |
|---|---|---|---|
| 4-29 | 9 Days Directional Drilling<br>Supervision @ 75.00<br>3-26-53 and 3-27-53<br>From 4-9-53 thru 4-12-53<br>and 4-15-53 thru 4-17-53 | 1060 | 675.00 |
| 4-29 | 5 Pacific Drilling Control<br>Whipstocks @ 225.00<br>Set at 3927'–3939'–5885'–<br>5960' and 6421' | 1060 | 1125.00 |
| | | TOTAL | 1800.00'' |

White testified that he was the only individual from Pacific to work on this job. He testified that ordinarily a written contract was not used in his business. He had been doing work for General since about 1947. ''The company would just call us up and have us come out there and we would bring our tools.'' The oil company would tell Pacific the direction it wanted the well to go, and Pacific told the driller what to do to obtain this result. Pacific charged so much per day for supervision and so much per tool. Pacific told the driller how to set the whipstock and how to drill off it, and how to pull it loose from the hole. Pacific's man would not be present 24 hours a day, but would be on call for any problems that might arise. Pacific ordinarily supplied the whipstock and sub, and usually the bit, but sometimes the oil company used its own bit. If a bit was furnished, Pacific charged the customer, but sometimes, if the bit was to be used more than once, it would not be charged until it was used on a subsequent job. Pacific specified the size of bit which was to be used in a particular operation. Pacific would tell the oil company what kind of bit was needed, and the company would order it out of its own stock if the company desired to do so.

A breaker is made to fit a particular size of bit. Ordinarily the bit company from which a bit is purchased furnishes a breaker which fits the bit. In practice, Pacific would see that a breaker was present when the bit was to be connected to the sub, but White did not consider a breaker necessary when breaking the sub from the drill pipe. When Pacific furnished both the bit and the sub it would not be necessary to break the bit from the sub at the well. It would be up to the oil company whether Pacific was to order a breaker with the bit.

White's testimony was given in the form of a deposition taken by plaintiff's attorney December 29, 1959, which was more than six years after the accident, and after White had retired from the business. He had no recollection whether the bit used on April 15 and 16, 1953, was furnished by Pacific, or whether Pacific had furnished a breaker. He testified to the various practices which had been followed, and he was asked to speculate and did to some extent speculate as to what might have occurred in that instance.

Plaintiff's evidence showed that the bit which was used was a Hughes 7⅝-inch bit. There was no evidence that this type of bit was used only by Pacific, or that it was used only for directional drilling. The invoice of charges for the job contained no charge by Pacific for a bit. Pacific's purchase records showed no Hughes 7⅝-inch bit purchased during the period from June 1, 1952, to June 1, 1953. White's testimony was that Pacific purchased bits as needed, and seldom had any on hand.

There is no evidence that Pacific was supervising or had undertaken any duty to supervise the breaking of the tools after they had been pulled from the well. Pacific's function was to supervise that part of the operation which was peculiar to directional drilling. All the rest of it was handled by General's driller, acting under the supervision of General's superintendent. White was not at the site at the time of the accident. After the whipstock had been pulled free at the bottom of the well about midnight, White went home and left to General's crew the business of lifting the tools and breaking them apart. There was nothing about breaking these tools which was peculiar to directional drilling or which required Pacific's specialized supervision. The evidence does not support any inference that Pacific neglected any duty to supervise.

Plaintiff's theory with respect to the breaker is (1) that Pacific furnished the bit, (2) that the party who furnishes

the bit is under a duty to furnish the breaker, and (3) that Pacific failed to furnish a breaker. There is no substantial evidence to support any of the three steps which are essential to plaintiff's conclusion. The most that can be deduced from the testimony is that Pacific may have furnished the bit. White's testimony, to the extent it favored the defense, must, under Code of Civil Procedure, section 2055, be disregarded in determining whether or not plaintiff made a prima facie case. What then remains of White's testimony is purely negative: He did not know whose bit was used. The same is true of the testimony of the two drillers who were called by plaintiff. There is no evidence that General requested Pacific to furnish either a bit or a breaker.

Furthermore, if it be assumed that Pacific furnished the bit, the evidence does not support the inference that a party who brings a bit to a drill site without bringing a breaker is negligent. General had a considerable quantity of drilling tools of its own, and Pacific's duty was to furnish equipment as directed. Bits wear out frequently, as the evidence shows, but there is no basis for inferring that an oil company buys a new breaker every time it buys a new bit. Thus if it be assumed that General lacked a Hughes $7\frac{5}{8}$-inch bit and requested Pacific to furnish one for this job, it does not follow that General lacked a breaker to fit that size of bit. What breakers General had on hand, or thought it had on hand, is not shown by the evidence here. Though we assume, in accordance with plaintiff's theory, that the jury could have found that it is negligence to attempt to break a sub without using a breaker, it is purely a matter of speculation as to whether General ordered or requested or expected or relied upon Pacific to furnish the breaker for this particular operation.

If it be assumed that Pacific had a duty to furnish a breaker with the bit, there is no substantial evidence that it failed to do so. It must be borne in mind that the breaker was to be used by General's employees, not Pacific's man. If Pacific furnished a breaker, it would do no more than make delivery to General's personnel at the drill site. Pacific set the first whipstock in this well on March 26, 1953. A $7\frac{5}{8}$-inch bit was used (make unspecified). The drilling log shows that on April 10, 1953, a Hughes $7\frac{5}{8}$-inch bit was used off a whipstock. The tools which were involved in the April 16 accident were made up on the morning of April 15. There is no evidence as to whether a breaker was or was not at the drill site on any of these earlier occasions when, according to plaintiff's evi-

dence, a breaker should have been used. Under the circumstances shown here the fact that General's crew failed to find a breaker at 2:15 a.m. on April 16 is not substantial evidence that Pacific had failed to bring one to the job site on or after March 26.

Plaintiff bases an argument upon the fact that the printed matter on the reverse side of the purchase order requires Pacific to furnish ''all labor, material, transportation, tools and equipment'' and to see that the work is done so as to reduce danger of injury to a minimum. However, the sweeping language of the printed matter is modified by the typewritten words which require Pacific to ''Furnish men, equipment and materials to set (4) removable whipstock and control, as directed.'' It is perfectly clear, both from the form of the purchase order, and from the nature of the business as described in the evidence, that Pacific was not to furnish all men and equipment or to assume all control. The entire drilling equipment, excepting only the whipstock and sub, and possibly the bit, belonged to General. Pacific furnished no men except White, who performed a very limited, specialized function. Pacific's obligation was to furnish men and equipment and supervision *as directed* by General. The purchase order cannot reasonably be read as requiring more. Plaintiff's evidence fails because it does not support a reasonable inference that General directed or requested Pacific to furnish any more equipment and supervision than were in fact furnished.

## *Fraudulent Concealment*

The evidence on the issue of fraudulent concealment differed substantially from what was alleged in the complaint. The critical allegations, which made it necessary to overrule the demurrer, were these: (1) Hesser, a safety engineer for General, came to plaintiff the morning after the accident and gave plaintiff a false statement of the cause of the accident, thereby deceiving plaintiff and, inferentially, concealing the culpability of Pacific; (2) Johnson, a claims agent for General, told plaintiff he did not have to sue until the time came when he no longer needed medical care; (3) General voluntarily undertook to advise plaintiff when he was in a critical condition concerning the cause of the accident, as well as later with respect to the nature and extent of his rights and remedies, and thereby became obliged to advise him fully concerning Pacific's participation and Pacific's liability; (4) General and

Pacific conspired to conceal the liability of Pacific, and to conceal General's financial interest in protecting Pacific.

At the trial plaintiff conceded that he could not testify to any communication with Johnson earlier than April 1955. Thus Johnson could not have said or done anything to cause plaintiff not to sue Pacific during the period of one year which the statute of limitations gave him.

As has already been pointed out, there is no evidence at all of collusion between General and Pacific.

█ Plaintiff's evidence concerning his conversations with Hesser fails to support the deception which was implicit in the allegations of the complaint. Hesser's duties as a safety engineer required him to investigate the accident and make a report. He visited plaintiff in the hospital. He read to plaintiff a statement made by the driller, Sam Young, which was an accurate recital of the events leading up to the injury. Plaintiff gave Hesser an oral statement, which Hesser reduced to writing. Plaintiff requested one change, which was made. Plaintiff signed the statement on April 30, exactly two weeks after the accident. This is also a factual statement, not substantially different from plaintiff's testimony in court as to how the accident happened. Hesser expressed to plaintiff the opinion that Young was at fault in that Young had applied the power before plaintiff had time to move away. Certainly no one can disagree with this conclusion, even though it be assumed that the lack of a breaker was a part of the causation. Plaintiff was of course aware of the need for a breaker, as he testified that he called this to Young's attention before the accident occurred.

Plaintiff would build an inference of fraud from the fact that Hesser discussed fault without mentioning the possible liability of Pacific. As a safety engineer, Hesser was investigating physical causes. There is no evidence that he discussed or was at all interested in legal liability. Pacific's liability, if any, would arise because of what it failed to do, not because it did any wrongful or unsafe act. To say that Young and Young's employer were at fault was neither false nor misleading, nor could such a statement be construed as indicating that Pacific was not legally liable.

█ Plaintiff's contention that General voluntarily assumed the responsibility of advising plaintiff as to his rights against third persons is likewise without support. The most that plaintiff has to offer on this point is the tenuous inference he

would draw from his testimony as to conversations he had with Hesser while in the hospital. The testimony is as follows: "Q. By Mr. Tanner: Going back to your conversations with Mr. Hesser in the hospital, do you recall what those conversations were following the time that you were free and outside the influence of morphine? Do you recall him visiting you there in the hospital? A. Just vaguely, I recall three or four times. He visited me quite often at first and then, as I got better, why, there were other people who were visiting me. The pusher would come, the superintendent; I remember him telling me that everything would be all right and taken care of and that the company would do all that was possible for me in any way, and that they would see that my rights was taken care of."

The evidence shows that plaintiff was "taken care of" in the sense that General did everything an employer is obligated to do for an injured employee, and more. General furnished all of the medical care that plaintiff required, paid plaintiff his full salary while disabled, and restored him to his old job when he was able to work again. There is no evidence that Hesser or anyone else was authorized to assure plaintiff that General would do for plaintiff what only a member of the bar could properly do: analyze his possible cause of action against a third party tortfeasor and advise him of his legal right to sue. The evidence, read as a whole, would not support a reasonable inference that Hesser's statement was intended to convey that meaning, or that plaintiff so understood it. Plaintiff was asked, "Did Mr. Hesser make any statement to you regarding your legal rights in connection with this accident at any time?" His answer was, "No."

One of Hesser's duties was to keep in touch with injured employees because his superior "wanted the employees to know that the company did have an interest in their well-being." Nevertheless, this concern for "well-being" cannot fairly be construed as an admission that the corporation had assumed the role of the injured employee's personal attorney.

The opinion of the appellate court which held that plaintiff's second amended complaint stated a cause of action recognized that the pleading was drafted to fit the pattern of *Kimball* v. *Pacific Gas & Electric Co.*, 220 Cal. 203 [30 P.2d 39]. Kimball, an employee of Pacific Gas, had been injured by the negligent act of a man named Wilson who was on the payroll of Pacific Gas, but who was, at the time of the accident, working as a special employee of General Electric. Kimball was unaware

that Wilson was working for General Electric. After the accident Pacific Gas and General Electric entered into an express agreement that General Electric would reimburse Pacific Gas for one-half of the workmen's compensation which Pacific Gas was required to pay to its injured employee. More than two years later Kimball discovered these circumstances and brought suit. The Supreme Court held the evidence sufficient to support a finding of fraudulent concealment which suspended the statute of limitations as to General Electric. The fraudulent concealment in the *Kimball* case rested upon two elements not present here. The first was that both the plaintiff and his wife specifically asked Wilson and several officials of Pacific Gas for full details of the accident, and although all of those persons discussed the details with Mr. and Mrs. Kimball, none of them disclosed that Wilson had been working for General Electric. Wilson's employment by General Electric was a simple, obvious fact known to each of the persons to whom inquiry was made, and it was inferable that each understood that this was the kind of information the Kimballs were seeking. The facts they gave the Kimballs were characterized as half-truths which amounted to a suppression of the other facts which they realized the Kimballs needed to know.

In the present case, the asserted liability of Pacific Drilling did not rest upon anything as simple and clear-cut as the fact that Wilson was an employee of General Electric. There is no showing that the subject of the contractual relationship between Pacific Drilling and General Petroleum was the subject of any inquiry by plaintiff or of any discussion between plaintiff and any of defendants' personnel. The discussion about the accident in this case, so far as the record shows, dealt with the events at the drilling site. There is no evidence that Hesser or Young or any of the unidentified production workers to whom plaintiff talked during the first year after the accident knew anything about the terms of the relationship between Pacific and General Petroleum. (The fact that Hesser and Young denied having such knowledge must be disregarded for the purpose of testing the nonsuit; the point is that there is no basis for inferring that they did know or believe there was a legal theory on which a claim might be made against Pacific Drilling.) What Hesser and Young said to plaintiff cannot be characterized as "half-truths." An intent to deceive cannot be inferred here as it was in the *Kimball* case.

The second factual basis for the finding of fraud in the *Kimball* case was that Pacific Gas compromised its cause of action against the third party tortfeasor without informing the injured employee. This was especially significant because of the provisions of the Workmen's Compensation Act pertaining to the sharing, as between employer and employee, of the recovery from the third party tortfeasor. The Supreme Court said: "We think that there was no duty on either company to volunteer the facts of the accident to plaintiff, but we think that when they began to negotiate between themselves as to the settlement of the claim, a positive duty existed to disclose those negotiations to plaintiff." (220 Cal. at p. 217.)

In the present case there is no evidence that plaintiff's employer ever asserted any claim against Pacific Drilling, or negotiated or received any reimbursement. So far as the record shows, it was and is General Petroleum's consistent position that Pacific Drilling was not at fault, and that General Petroleum is not entitled to recover from Pacific Drilling any of the benefits paid to plaintiff. Nothing in the record casts any doubt upon the sincerity of that belief.

Plaintiff's argument has placed much emphasis upon his contention that General Petroleum had a "financial interest" in concealing plaintiff's cause of action against Pacific Drilling. The theory appears to be that if plaintiff had made a recovery against Pacific, the latter would then have recovered over against General as the party whose active negligence caused the injury, under the authority of *San Francisco Unified School Dist.* v. *California Building Maintenance Co.,* 162 Cal.App.2d 434 [328 P.2d 785]. Thus, plaintiff contends, General had a motive to prevent plaintiff from suing Pacific.

It is not necessary to consider whether there could have been such a right to indemnification. Plaintiff's argument confuses motive with intent. If plaintiff had substantial evidence that General had intentionally deceived plaintiff to his damage, the nonsuit would have been improper even though plaintiff had been unable to show how such conduct would benefit the defendant. ▮ Evidence that General would profit financially by engaging in fraud might help make it appear more probable that such deception was actually practiced. However, absent proof of the act, evidence of motive alone would not make a prima facie case. It seems hardly necessary to point out that a man who might gain a

financial advantage by cheating is nonetheless deemed an honest man unless there is some evidence that he did cheat.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied January 17, 1963, and appellant's petition for a hearing by the Supreme Court was denied February 20, 1963.